UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RYAN NOAH SHAPIRO,  )<br>  )<br> PLAINTIFFS  )<br> vs.  )<br>  )<br> DEPARTMENT OF JUSTICE,  )<br>  )<br> DEFENDANT  )<br>  )<br> _____ ) | Civil Action No. 1:16-cv-1399 (RDM) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## STATEMENT OF FACTS

### A.  Mosaic Theory and Operation Mosaic

The mosaic theory of intelligence "describes a basic precept of intelligence gathering: Disparate items of information, though individually of limited or no utility to their possessor, can take on added significance when combined with other items of information. Combining the items illuminates their interrelationships and breeds analytic synergies, so that the resulting mosaic of information is worth more than the sum of its parts." D. Pozen, *Note: The Mosaic Theory, National Security, and the Freedom of Information Act*, 115 Yale L.J. 628, 630 (Dec. 2005). The Department of the Navy's FOIA regulations define the theory (which is often referred to as the "compilation theory") as "[t]he concept that apparently harmless pieces of information when assembled together could reveal a damaging picture." 32 C.F.R. 701.31 (2005). "For

1

several decades, government agencies have invoked mosaic concerns to justify . . . withholding documents requested through FOIA[.]" Pozen at 630.

While the mosaic theory may have some surface appeal, it also has the potential for abuse. "[W]hile the mosaic theory provides an accurate description of how adversaries might capitalize on information disclosure, courts have - in deference to agencies' perceived superiority at evaluating mosaic threats - applied it in ways that are unfalsifiable and deeply susceptible to abuse and overbreadth; they have created in the mosaic theory a latently subversive basis for withholding information. When courts accord heightened deference to agencies' mosaic claims, moreover, they contravene the text and purpose of FOIA." *Id. See also* C. Wells, CIA v. Sims*: Mosaic Theory and Government Attitude*, 58 Admin. L. Rev. 845, 853-56 (2006).

After the 1974 amendments to FOIA, the FBI sought to rely on the mosaic theory to deny FOIA requests. Specifically, the agency looked into how the mosaic theory could allow the agency to withhold information that was not covered by any specific exemption. Then-director of the FBI, William Webster, explained in an article:

> "Not too long ago, we ran a test called 'Operation Mosaic.' We reviewed FOIA materials that already had been released. The exemptions had been applied, and the material released was what we thought was safe material. But we discovered that seemingly innocuous information can be combined with records released at a different time or with the requester's personal knowledge. This could reveal clues as to the identity of FBI sources or the extent of an FBI investigation. Obviously, our FOIA analysts have no way of knowing what information each requester possesses." (Ex. 16 at 6-8.)

The article then argued that the definition of "reasonably segregable" should be changed "to allow us to withhold information that, on its face, does not fall within these exemptions but can be pieced together with other information known to the requester to reveal exempt information." (Ex. 16 at 8.) A copy of the article was sent to Paul Weyrich,

2

President of the Free Congress Research and Education Foundation and filed in case file 94-69979. (Ex. 16 at 1-2.)

In an FBI document containing the text of Director Webster's address to the National Conference of Bar Presidents in 1981, Operation Mosaic is again mentioned. (Ex. 14 at 6.) Further, in supplemental material submitted to the House Committee on Government Operations in 1979, Director Webster stated, "Our analysts have adopted a more conservative disclosure approach since the development of the mosaic study. Recent FBI analysis indicates that using a more conservative disclosure approach does lessen, but cannot eliminate, the potential of recipients to identify FBI confidential sources from record disclosures." (Ex. 15 at 3.)

For decades, the mosaic theory has been an enduring part of the FBI's litigation strategy for withholding records under FOIA. *See e.g., Edmonds v. United States DOJ*, 405 F. Supp. 2d 23, 32 (D.D.C. 2005) ("The DOJ and the FBI contend that the information forms a 'mosaic' of classified information about the methods and activities still used by the FBI to gather intelligence"); *Halkin v. Helms*, 598 F.2d 1, 8 (D.C. Cir. 1978) ("It requires little reflection to understand that the business of foreign intelligence gathering in this age of computer technology is more akin to the construction of a mosaic than it is to the management of a cloak and dagger affair. Thousands of bits and pieces of seemingly innocuous information can be analyzed and fitted into place to reveal with startling clarity how the unseen whole must operate.")

Nevertheless, courts have at times been skeptical about the government's use of the mosaic theory. *See e.g., Al-Adahi v. Obama*, 698 F. Supp. 2d 48, 55 (D.D.C. 2010) ("Even using the Government's theoretical model of a mosaic, it must be acknowledged

that the mosaic theory is only as persuasive as the tiles which compose it and the glue which binds them together – just as a brick wall is only as strong as the individual bricks which support it and the cement that keeps the bricks in place. Therefore, if the individual pieces of a mosaic are inherently flawed or do not fit together, then the mosaic will eventually split apart, just as the brick wall will eventually collapse.") *Ctr. for Nat'l Sec. Studies v. United States DOJ*, 215 F. Supp. 2d 94, 104 (D.D.C. 2002) ("Application of the mosaic theory would allow the Government to sidestep this Exemption 7A requirement"), *rev'd* 331 F.3d 918 (D.C. Cir. 2003).

Records revealing the historical development of the mosaic theory, the FBI's Operation Mosaic, the use of mosaic arguments in the FOIA context, and other matters related to mosaic analysis are of great interest to Plaintiff and will substantially enlighten the public as to the FBI's performance of its duties, including the empirical basis, if any, for its use of the mosaic theory in the FOIA context.

### B.  Plaintiff's FOIA Requests

Little is publicly known about Operation Mosaic or any mosaic study conducted by the FBI relating to FOIA. Thus, Plaintiff submitted several requests relating to Operation Mosaic, mosaic studies, and other records relating to the term "mosaic" in the FOIA context. When the FBI failed to locate responsive records, Plaintiff also submitted a request for records relating to the processing of these earlier requests.

Six of Plaintiff's requests to FBI are at issue in this case:

(1) a June 5, 2014 request for records "constituting, or relating or referring to FBI file 94-69979" (the file in which the Webster article was placed) (Ex. 18 at 17);

(2) a June 5, 2014 request for "'94' files relating or referring to the Freedom of Information Act and/or the Privacy Act" (Ex. 18 at 8);

(3) a June 5, 2014 request for various categories of records relating to "Operation Mosaic" (Ex. 18 at 20);

(4) a June 5, 2014 request for various categories of records relating to "Mosaic" (Ex. 18 at 1);

(5) a December 15, 2014 request for records relating to "Operation Mosaic" and "mosaic study" (Ex. 18 at 11); and

(6) a May 11, 2016 request for records relating to the processing of Plaintiff's earlier requests (Ex. 18 at 5).

Also at issue in this case is one of Plaintiff's FOIA requests to OIP, which similarly sought records relating to the processing of Plaintiff's previous FOIA requests to the FBI (Ex. 18 at 25.)

In his requests, Plaintiff supplied ample documentation and background information about the subject matter of his requests. For example, Plaintiff included copies of the

Webster documents referred to in the previous section,[1] and brought to the attention of the FBI that specific markings on these documents indicated the offices where additional records were likely to exist. (*See e.g.*, Ex. 18 at 1, 14-16, 18, 21-23.) Nevertheless, the FBI failed to search the locations where records were likely to be found using methods likely to locate the records.

### C.  The Electronic Case Filing System

The FBI's declaration describes the Universal Name Index (UNI) application, which is part of the Automated Case Support (ACS) system. (Hardy Decl. ¶ 89.) However, the declaration fails to note that the UNI is only one of three applications that make up the ACS. According to a declaration submitted by Mr. Hardy in another case, "ACS consists of three integrated, yet separately functional, automated applications that support case management functions for all FBI investigative and administrative cases[.]" (Ex. 6 at 2.) These three applications are the UNI, the Investigative Case Management (ICM), and the Electronic Case File (ECF). (Ex. 6 at 2-3.)

The ECF is the "main, and most extensive ACS database," (Ex. 4 at 2) and serves as the central electronic repository for the FBI's official text-based documents. (Ex. 6 at 2-3.) As Mr. Hardy conceded in another case, "[b]ecause the decision to index names in a specific document can vary from document to document, the text search provide[s] a more comprehensive search of the CRS." (Ex. 5 at 2.)

---

[1] To avoid repetition, these attachments have been excluded from Plaintiff's Exhibit 18, which contains Plaintiff's FOIA requests. However, Plaintiff's requests in their entirety, including all attachments, can be found as attachments to the Hardy Declaration filed by the Defendant in support of its Motion for Summary Judgment.

To search the text of records uploaded into ACS, a FOIA analyst simply opens a tab labeled "ACS ECF Search." (Ex. 3 at 1.) The search will return documents that contain the search term or phrase exactly as entered. (Ex. 3 at 2.) If too many documents are returned, the FOIA analyst can use search words to find two or more terms within the same document. (Ex. 3 at 3.) To do this, an analyst would employ "Boolean search operators" such as "and," "or," "not," "adj" (second word following the first), and "near." (Ex. 3 at 4.) An ECF "Advanced Search" can also be performed from the ACS ECF Search Tab. (Ex. 3 at 6.) The ECF Advanced Search allows the analyst to search not only by text, but also by Case ID, To and From, and also to filter by other document attributes. (Ex. 3 at 7.) The FBI currently trains employees to use the ECF application which is part of Sentinel rather than the one that is part of ACS, but the process is essentially the same. (Ex. 2 at 4-5.) The results of an ECF search in Sentinel can also be "sorted by date or narrowed by case type, field office, type of document, and date." (Ex. 2 at 6.)

The FBI's current policy is to perform an ECF search only in very limited circumstances. Employees are trained that "[c]ertain requests may require a specialized search in ACS by a search term though [sic] the use of Electronic Case File (ECF)." (Ex. 2 at 3.) The instances in which FBI employees are taught to perform an ECF search are where "[t]he request is for a very specific item that was not located during an ACS search"; the case is "marked High-Visibility"; or when directed to do so by a supervisor. (Ex. 2 at 2.)

**ARGUMENT**

**I.      The FBI's search for responsive records was inadequate.**

The adequacy of an agency's search depends on the facts of each case. *Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) ("The adequacy of the search, in turn, is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case"); *Oglesby v. United States Dep't of the Army*, 79 F.3d 1172, 1179 (D.C. Cir. 1996) ("[R]esolution of the issues raised by Oglesby's appeal depends on a fact-intensive analysis of each of the agencies' searches and declarations[.]") Thus, whether or not the FBI must conduct an ECF full-text search in response to a particular FOIA request will vary from case to case. *Shapiro v. DOJ*, 34 F. Supp. 3d 89, 98-99 (D.D.C. 2014) ("Although the Court recognizes that a full-text search may not be warranted in every case, it finds the FBI's explanation as to why it was unwarranted here to be lacking.")

To determine whether the FBI's refusal to perform an ECF full-text search is justified in *this* case, the Court must ask two questions. First, has the FBI demonstrated beyond material doubt that its search of the CRS through the UNI index alone was reasonably calculated to uncover **all** relevant documents? *Nation Magazine v. United States Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995) ("To win summary judgment on the adequacy of a search, the agency must demonstrate beyond material doubt that its search was reasonably calculated to uncover **all** relevant documents") (emphasis added, internal quotation marks omitted). Second, has the FBI provided a sufficient explanation of why a full-text ECF search be unreasonably burdensome? *Id.* at 892. ("On remand, the district court should order Customs to search its reading files for this document if it cannot

8

provide sufficient explanation as to why such a search would be unreasonably burdensome.")

While a convincing argument can be made that a UNI index search alone is rarely, if ever, reasonably calculated to uncover all relevant documents, the Court need only consider the adequacy of the FBI's search under the facts of this case. Here, an index search is not likely to uncover all relevant records because of the nature of Plaintiff's requests. According to the FBI's declarant, "The general indices are arranged in alphabetical order and comprise an index on a variety of subject matters to include **individuals, organizations, events, or other subjects of investigative interest** that are indexed for future retrieval." (Hardy Decl. ¶ 79) (emphasis added). But Plaintiff's requests are not for information on specific individuals, organizations, events or other subjects of investigative interest. They relate instead to FBI's administration of FOIA matters and to the conceptual framework of the mosaic theory. Therefore, Plaintiff's requests do not fall within the subject matters that would be indexed.

The FBI's declarant further explains, "FBI employees may index information in the CRS by **individual** (persons), by **organization** (organizational entities, places, and things), and by **event** (e.g., a terrorist attack or bank robbery). Indexing information in the CRS is based on operational necessity, and the FBI **only indexes that information considered relevant and necessary for future retrieval**. Accordingly, the FBI does not index every individual name or other subject matter in the general indices." (Hardy Decl. ¶ 80) (emphasis added). Thus, not only are FBI employees limited to indexing information by individual, organization, or event, they do not even index all such information. Rather, they have discretion to index only that information considered

relevant and necessary for future retrieval. It is therefore unlikely that an index search of the UNI alone would be reasonably likely to uncover **all** relevant records responsive to the requests at issue here. Because of the discretionary nature of the UNI indexing, this Court has scolded the FBI for "repeatedly conduct[ing] searches of only the one record system, UNI," and held that where an FBI search "never ranged beyond the UNI," the FBI "failed to demonstrate beyond material doubt that its . . . search was reasonably calculated to uncover all relevant documents." *Negley v. FBI*, 658 F. Supp. 2d 50, 58 (D.D.C. 2009).[2]

As to the burdensomeness element, an ECF full-text search would be reasonably likely to locate responsive records without an undue burden on the agency. In the past, the FBI has made generic claims about the burdensomeness of an ECF full-text search, describing it as an "extraordinary measure" which "generally return[s] a significant number of 'hits' that are random and incomplete references[.]" (Ex. 7 at 2.) The FBI contends that it then must go through a time-consuming hit-by-hit analysis which "uses a significant amount of resources[.]" (Ex. 7 at 2-3.) Whether or not an ECF full-text search is "generally" time-consuming, however, it would not be in this case.

To begin with, an ECF full-text search is easy to design and execute. A real-life example of an ECF search performed by an FBI agent is: "VIENNA AND DROP" (Ex. 4 at 4).  If too many "hits" are returned, the user can narrow or filter the results by, for example, adding a date range. Thus, the user who searched for "VIENNA AND DROP" subsequently searched for "VIENNA AND DROP [Dates=01/06/1999-03/11/1999]" to

---

[2] The court in *Negley* permitted discovery on the issue, including a deposition of Mr. David Hardy, leading to the record in the case being more robust than in other cases addressing the same issue.

narrow the number of results. (Ex. 4 at 4.) A user can also add additional keywords or limit the search to certain document types or case files. (Ex. 3 at 4, 7; Ex. 2 at 6.) Each "hit" can then be reviewed to determine if it is actually responsive to the FOIA request.

There are certainly circumstances under which an ECF full-text search might be unduly burdensome. For example, consider a requester named John Smith who asks for all documents about himself and provides only minimal information such as his date of birth. A full-text ECF search for "John Smith" would likely yield a large number of potentially responsive documents, each of which would need to be examined to determine which ones referred to the John Smith who is the requester. In some circumstances, the hit might not even contain enough information about the referenced John Smith to determine if it is the same person as the requester. (Ex. 7 at 3.)

These concerns are not present in the instant case, however. Terms such as "94-HQ-69979" or "Operation Mosaic" are singular in nature, and therefore all of the results of an ECF full-text search would be responsive records. Moreover, even if the terms were not sufficiently unique on their own, the results could be easily filtered or narrowed based on additional information provided in Plaintiff's requests.

In addition to the FBI's failure to conduct an ECF full-text search, there are additional problems with its search methodology for particular requests. Each of these will be addressed in turn.

Records constituting, relating or referring to file number 94-HQ-69979 (FOIPA 1272678-000)

Plaintiff requested records "constituting, or relating or referring to FBI file 94-69979." (Ex. 18 at 17.) In response to this request, the FBI contacted the FBI's

Alexandria Records Center (ARC) and requested a copy of the physical file 94-HQ-69979. (Hardy Decl. ¶ 91.) Mr. Hardy's two sentence explanation of the FBI's search with respect to FOIPA 1272678-000, however, fails to state what the FBI did to review and process the physical file. For example, the declaration is silent as to whether the search included a review of any subfiles, bulky exhibits, 1A material, or unserialized records.

More fundamentally, however, doing nothing more than retrieving and reviewing the physical file 94-HQ-69979 does not constitute a search reasonably designed to locate records "relating or referring" to that file number. By contrast, ECF full-text searches of "94-HQ-69979" and "94-69979" would be reasonably likely to locate all responsive records, and would not be unduly burdensome because those terms are singular in nature. Therefore, the FBI's search was not adequate.

Records relating to "Operation Mosaic" and "mosaic study" (1272573-001)

Plaintiff requested records relating to "Operation Mosaic" and "mosaic study[.]" (Ex. 18 at 11.) In response to this request, the FBI conducted an index search through the UNI application in both ACS and Sentinel. (Hardy Decl. ¶ 89.) The FBI asserts that it located only one responsive record, and that record had previously been released to Mr. Shapiro. (Hardy Decl. ¶ 89.) For the reasons that follow, the FBI's search was not reasonably calculated to uncover all responsive records, and was therefore inadequate. Further, the FBI improperly failed to process and release non-exempt portions of records that the FBI itself deemed responsive.

An adequate search for responsive records would necessarily have included an ECF full-text search, with potential keywords such as "Operation Mosaic," "mosaic study," "mosaic analysis," and "mosaic theory." These terms are singular in nature and therefore all hits would be for responsive records. Moreover, even if an ECF text search somehow returned nonresponsive records, the FBI could have filtered the results by date or narrowed the search by using additional keywords (e.g. "operation mosaic" AND "Freedom of Information").

The FBI itself recognizes that there are situations "in which there is a benefit and utility to the FBI conducting full-text searches of the CRS[.]" (Ex. 7 at 3.) The FBI recognizes two such situations: "when: (a) a search of the CRS locates no records but the FBI has reason to believe that responsive records likely exist; or (b) a search of the CRS results in some records being located but there is information indicating that more specific responsive records likely exist." (Ex. 7 at 3.) Thus, the FBI has occasionally performed ECF searches once litigation has begun, but without an order from the court. *See ACLU v. FBI*, No. C 12-03728 SI, 2013 U.S. Dist. LEXIS 93079 at *7 (N.D. Cal. July 1, 2013) ("The FBI searched the CRS indices using 43 separate terms related to the Occupy movement, but did not find any responsive records. Then the FBI conducted text search of its Electronic Case File ('ECF'), which is an electronic repository for official text-based documents. Through this method, the FBI found the responsive documents that were partially released to plaintiffs"); *Williams v. FBI*, No. 2:13-cv-00056-DN, 2014 U.S. Dist. LEXIS 43955 at *11-*12 (D. Utah Mar. 31, 2014) ("In the second declaration submitted by the FBI, Hardy clarifies that '[d]ue to the specific nature of the request, the FBI went beyond its normal searching policies and conducted a text search of the ECF'

using a variety of search terms in an attempt to locate the Freeh Memorandum.") *But see Coss v. United States DOJ*, 133 F. Supp. 3d 1, 3 (D.D.C. 2015) (in case without any indication that responsive records likely exist, "FBI used its Electronic Case File (ECF) system, one of three applications that organize information stored in the CRS, to conduct a full-text search of the system for 'Guillermo Casas notebook' and 'Casas notebook.'")

Plaintiff does not agree that the two situations identified by the FBI are the only two in which an ECF full-text search is warranted or necessary for an adequate search. Moreover, the FBI's own internal policy cannot determine its obligations under FOIA. *Wiesner v. FBI*, 577 F. Supp. 2d 450, 457 (D.D.C. 2008) ("the FBI's naked reliance on its own procedures does not satisfy its duty to construe a FOIA request liberally") (internal quotation marks omitted), *vacated in part as to other defendant*, 668 F. Supp. 2d 164 (D.D.C. 2009); *Negley*, 658 F. Supp. 2d. at 58 ("Regardless of any policy or conventional operating procedures, it is clear that Plaintiff's requests required Defendant to perform more rigorous searches for responsive documents.") Nevertheless, even under the FBI's own policy, an ECF full-text search is appropriate here.

According to Mr. Hardy's declaration, after conducting an index search of UNI for the search terms "Operation Mosaic," "Mosaic Study," and "Mosaic," the FBI was unable to identify responsive records indexed to those terms. (Hardy Decl. ¶ 88.) However, the FBI knew from Plaintiff's request, including the addendums, that the FBI had conducted a study known as "Operation Mosaic" and therefore that responsive records related to the study likely exist (and, of course, the addendums themselves constitute responsive records). Thus, an ECF full-text search would have been appropriate even under the FBI's own policy.

But there is more. Although Mr. Hardy's declaration makes absolutely no mention of it, the FBI did in fact locate a plethora records which the agency itself deemed to be responsive to Plaintiff's requests. (Ex. 12.) The chart – which Plaintiff only obtained because he submitted a separate FOIA request for the "190" file related to his requests – reveals that 66F-SU-55780 (serial 7/14/93), 66F-RO-A5618 (serial 8/5/93), 66F-AQ-A965 (serials 7/14/93; 2/2/94), 66F-CE-A2543 (serial BUAIRTEL DATE C*), 66F-CG-A2654 (serial GREEN AIRTEL), 66F-CO-A105 (HQ AIRTEL 071493), 66F-DL-A1460 (serial 7/14/93), 66F-DN-A1717 (serial 7/14/93), 66F-LO-A12496 (serial HQ AIRTEL 7/14/93), 67-BS-0 (serial 38520), 67-PX-00 (serial 1463), 80-NK-637 (serial 103), and 12 files for which the number is redacted, are all "responsive" to an ACS string search for "Mosaic Study." (Ex. 12.) Additionally, one document, the file number for which is redacted, was "potential[ly]" responsive. (Ex. 12.) Further, files 66F-KC-A3070, 66F-KC-A3492, and one document the number for which is redacted, were removed by an analyst for being "not subject," although it is unclear what else records on a mosaic study could possibly have referred to. Two additional documents were responsive to an ACS search for Mosaic Study Personnel Matter: 66F-NF-A1038 (serial 16) and 66F-HK-A2-A (serial BUAIRTEL dated HK*). Mr. Hardy provides no explanation as to why these documents which the FBI itself deemed to be responsive to Plaintiff's request were never accounted for.

"Mosaic" (FOIPA 1272599-000)

Plaintiff submitted a FOIA request on June 5, 2014 which sought, *inter alia*, (1) "all manuals, policies, guidance, curriculum, standard operating procedures, training

materials, PowerPoint slides, or other instructional or policy records containing the word 'mosaic'"; (2) emails containing the term "mosaic," including emails to or from enumerated individuals; (3) other correspondence or memoranda containing the word "mosaic"; (4) 62, 80, 94, 190, and 197 files containing the word "mosaic." (Ex. 18 at 1.)

In response to this request, the FBI conducted an index search in UNI for the search term "mosaic." (Hardy Decl. ¶ 88.) This index search, however, was not reasonably designed to locate all responsive records. With respect to the first part of Plaintiff's request, the FBI did not search the CRS in a manner designed to locate training and policy records, and did not conduct a search outside of the CRS for responsive records. The FBI would have been able to locate material inside the CRS simply by conducting various ECF text searches such as "'mosaic' AND 'standard operating procedure'" or "'mosaic' AND 'policy'". (Ex. 3 at 4.) To locate responsive material outside of the CRS, the FBI would need to consult with the relevant divisions, e.g., the training division for training material. For example, in another case in which a plaintiff sought training material related to FOIA, "RIDS personnel consulted personnel from the Training Division and requested them to search for any training material used at the FBI's Quantico training facility, the National Executive Institute, Law Enforcement Executive Development Seminar (LEEDS), International Law Enforcement Academy, or the FBI's Virtual Academy discussing or mentioning FOIA or the Privacy Act." (Ex. 13.) The FBI did no such consultation here.

With respect to the second part of Plaintiff's FOIA request (emails containing the term "mosaic") the FBI not only failed to search the email accounts of the enumerated records custodians, but failed to search any email accounts whatsoever. Certainly, some

emails would be captured in a search of the CRS. For example, a UNI index search for records about a detainee interrogated by the FBI would be reasonably expected to locate emails pertinent to the investigation. *See Mobley v. CIA*, 806 F.3d 568, 582 (D.C. Cir. 2015). Here, however, there is no reason to believe that all emails containing the word "mosaic" would find their way into the CRS, let alone that they would all be indexed to the word "mosaic." Therefore, the FBI should be required to search its email records system (e.g., GroupWise, Microsoft Exchange) for records to/from the individuals named in Plaintiff's FOIA request and any other records custodians the FBI identifies as likely to possess responsive records.

With respect to other memoranda and correspondence, the FBI should be required to conduct a targeted search of those offices likely to possess responsive records. For example, the FBI's Office of Congressional Affairs is likely to possess any correspondence to/from Congress mentioning "mosaic," and the FBI's Intelligence Branch and Counterintelligence Division are likely to possess memoranda discussing the mosaic theory of intelligence. Such records, which may not relate to a specific investigation, administrative, or personnel matter would be unlikely to be located in the CRS, and even if they were in the CRS, would be unlikely to be located through a UNI index search. To the extent that such records may be in the CRS because they relate to a particular administrative matter, for example, only an ECF full-text search would be likely to return responsive records. For example, a previously released document, 66-HQ-19249 (serial 431) consists of correspondence between NARA and FBI, and includes a discussion of the mosaic theory. (Ex. 20 at 1, 7-8.) The only way such a document would be locatable is through an ECF full-text search.

Finally, the FBI can easily design a search to locate all 62, 80, 94, 190, and 197 files containing the word "mosaic." The FBI simply needs to conduct an ECF search for the term "mosaic" and filter the output to only those case files in the designated file classification codes. Such a search is almost certain to locate responsive records not found during the UNI index search. For example, "197" files are litigation files, and 197 files would therefore include declarations and briefs which are part of the many FOIA lawsuits in which the FBI has argued for the application of mosaic theory. Yet FBI agents and/or attorneys would be unlikely to index a brief with the term "mosaic" simply because the mosaic theory is discussed in the brief. Therefore, an ECF full-text search is the only method reasonably calculated to uncover responsive records in the enumerated file classification codes containing the word "mosaic."

"Operation Mosaic" topics (FOIPA 1272573-000)

Plaintiff submitted a FOIA request on June 5, 2014 which sought, *inter alia*, (1) records relating to the decision to initiate Operation Mosaic; (2) records relating to "[r]esearch for, implementation of, conducting of, assessment of, and termination of Operation Mosaic"; (3) records about the dissemination of Operation Mosaic information; (4) "[i]nstructional records, policy records, or memoranda relating or referring to Operation Mosaic"; (5) 62, 80, 94, 190, and 197 files relating or referring to Operation Mosaic; (6) records relating to the FBI's monitoring of the results of Operation Mosaic, including press clippings. (Ex. 18 at 20.)

For substantially the same reasons described in the previous section, the FBI should have conducted an ECF full-text search for the phrase "Operation Mosaic." Additionally,

the FBI should have searched those specific offices likely to possess records responsive to each individual part of this request. The specific offices identified in Plaintiff's request (Ex. 18 at 21) would have had a strong interest in Operation Mosaic, and would therefore be likely to possess responsive records. For example, the dissemination of information to the public relating to Operation Mosaic would likely be found in the Office of Public Affairs; the dissemination of information to Congress would likely be found in the Office of Congressional Affairs and the Office of the Director (in light of Webster's response to congressional inquiries on the matter); and RIDS, the FBI section in charge of FOIA matters (as well as its parent, Records Management Division) would have an obvious interest in a study involving the operation of FBI's FOIA operations and strategy.

Further, a positive indication that these offices are likely to possess responsive records is located on the face of the attachments to Plaintiff's FOIA request, as pointed out in his request. (Ex. 18 at 21.) According to the Webster article, the FBI "Research Unit, Office of Congressional and Public Affairs, and the FBI Freedom of Information-Privacy Acts Section, Records Management Division" assisted in the preparation of the article. (Ex. 16 at 2.) The cover letter attached to the article also mentions that the article was prepared jointly by "the Training and Research Unit, Records Management Division, and by the Research Unit, OCPA. Editorial input also provided by the Congressional Affairs Unit and Reading Room, OCPA, and by [REDACTED] Special Assistant to the Director." (Ex. 16 at 1.)

Finally, the FBI can easily design an ECF text search to locate all 62, 80, 94, 190, and 197 files containing the phrase "Operation Mosaic." As described in the previous section, the FBI simply needs to conduct an ECF text search for the term "mosaic" and filter the

output to only those case files in the designated file classification codes. Such a search is almost certain to locate responsive records not found during the UNI index search.

"190" files for previous FOIPA requests on Operation Mosaic and 94-HQ-69979 (FOIPA 1351095-000 and FOIPA 1353203-000)

The FBI searched its FOIA Data Processing System (FDPS) for records responsive to Plaintiff's FOIA requests relating to processing of his earlier requests. The FBI asserts that it "concluded that FDPS is the only system likely to contain the records sought by plaintiff, and a search of this system was reasonably expected to locate the requested responsive records." (Hardy Decl. ¶ 93) However, the FBI provides no explanation whatsoever as to why FDPS is the *only* system likely to contain the records sought.

Plaintiff requested "disclosure of the entire '190' file for" specified FOIPA requests. (Ex. 18 at 6.) A "190" file refers to the classification code 190 which the FBI uses to maintain FOIPA-related records in its CRS. (Ex. 17.) Yet the FBI does not aver that it searched the CRS for responsive records, although in an acknowledgment letter sent to Plaintiff and signed by Mr. Hardy, the FBI indicates that it is "searching the indices to our Central Records System for the information responsive to this request," (Ex. 19) suggesting that the FBI itself believed that the CRS was a location where responsive records were likely to be found. The FBI's search was therefore inadequate because it failed to include any record systems outside of FDPS.

## II.     The FBI improperly refused to process Plaintiff's request for 94 files relating or referring to FOIA and/or the Privacy Act (FOIPA 1272733-000).

Another FOIA request submitted by Plaintiff sought "any and all '94' files relating or referring to the Freedom of Information Act and/or the Privacy Act." (Ex. 18 at 8.) To assist the FBI with its search, Plaintiff's request provided a list of illustrative search terms that the FBI might use, such as "FOIPA," "FOI/PA," "FOIA/PA," and "Freedom of Information Act." (Ex. 18 at 8.)

In response to Plaintiff's request for "94" files relating or referring to FOIA/PA, the FBI "manually search[ed] through a small sample of these 94 files" and when the "search failed to locate responsive records and with no indication that continued searching would locate any responsive material, RIDS discontinued its search as it became evident that plaintiff's request was unduly burdensome." (Hardy Decl. ¶ 92.) This is an odd way to conduct a search for responsive documents, to say the least. It is absurd for the FBI to contend that it satisfied its statutory duties under FOIA by reviewing a few completely random documents in the 94 file classification, determining that they are not responsive to Plaintiff's FOIA request, and then concluding that it would be too burdensome to find responsive records. *Of course* pulling random files from shelves would be an extremely burdensome way of locating responsive records. The problem lies not with Plaintiff's request, however, but with the FBI's search methodology. This search strategy was designed to fail and did not include "methods which can be reasonably expected to produce the information requested." *Oglesby v. United States Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). It is about as far from a "systematic approach to document location" as an agency could get. *Id.*

All that the FBI needed to do to locate responsive records is to conduct an ECF full-text search for appropriate keywords (e.g., "FOIA") and narrow or filter the search results to records within the "94" classification code. The FBI's own training material demonstrates that the results of a FOIA search can be narrowed by various attributes including case type. (Ex. 2 at 6.)

Even if the FBI somehow could not conduct an appropriate search through ECF, the agency does not explain why it could not conduct a more systematic manual search of the 94 classification files. The FBI notes that 94 files "are not separated by years," but it does not explain how they *are* arranged. (Hardy Decl. ¶ 92.) The files in classification 94 are arranged, at the broadest level, by topic, and many of the topics are clearly irrelevant to Plaintiff's FOIA request. (Ex. 1.) For example, there is no reason for the FBI to search its 94 files on parole matters for records responsive to Plaintiff's request. The FBI provides no details about how its 94 files are arranged (other than indicating that they are not arranged by year) and therefore it is difficult for Plaintiff to describe with specificity precisely how the FBI might conduct a manual search. Nevertheless, it is not Plaintiff's burden to do so, and the matter is ultimately moot because the FBI can simply conduct an ECF full-text search.

### III.     The FBI and OIP improperly redacted non-exempt information.

#### A.  Exemption 5-1 (Deliberative Process Privilege)

The FBI made numerous redactions throughout the FOIPA processing notes and related pages on the grounds that the withheld material is protected by the deliberative

process privilege.[3] This factual material, which reveals nothing about the FBI's internal deliberations, is being improperly withheld.

"The deliberative character of agency documents can often be determined through the simple test that factual material must be disclosed but advice and recommendations may be withheld." *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1537 (D.C. Cir. 1993) (internal quotation marks omitted). The FBI asserts that the withheld material is deliberative because it "consist[s] of preliminary opinions, evaluations, and comments of FBI staff pertaining to the processing of plaintiff's FOIPA Request[s.]" (Hardy Decl. ¶ 103.) However, a review of the redacted documents reveals that the withheld information is primarily factual in nature, including such matter as file numbers and names of recordkeeping systems. (Ex. 11.) As Mr. Hardy concedes, the withheld material includes "information concerning specific databases used to locate and/or obtain potentially responsive records" (Hardy Decl. ¶ 104) and consists not only of "recommendations" but also "document[ation of] the various steps[ and] efforts . . . involved in responding to FOIPA requests" (Hardy Decl. ¶ 103).

Plaintiff suggests that the Court examine *ex parte*, *in camera* the unredacted version of these documents to determine the extent to which they consist of factual material, rather than advice and recommendations. The pages are few in number (nine) and the contents of the withheld information – not just purely legal issues – are involved. *Carter v. United States Dep't of Commerce*, 830 F.2d 388, 393 (D.C. Cir. 1987) ("[W]hen the requested documents are few in number and of short length, *in camera* review may save time and money. . . . When the dispute turns on the actual contents of the documents, *in*

---

[3] The relevant redactions in the released pages are highlighted. (Ex. 11.)

*camera* inspection is likely to be helpful. However, *in camera* review is of little help when the dispute centers not on the information contained in the documents but on the parties' differing interpretations as to whether the exemption applies to such information.")

Of course, the "use of the factual matter/deliberative matter distinction produce[s] incorrect outcomes in a small number of cases." *Dudman Commc'ns Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987). This case, however, is not one of that small number. At issue here are "raw facts" such as the file numbers of files that were searched, and these types of facts are unlikely to be the type of material that a FOIA analyst would "fudge." *Quarles v. Dep't of Navy*, 893 F.2d 390, 392 (D.C. Cir. 1990) ("Courts have typically required disclosure of purely factual material, presumably because the prospect of disclosure is less likely to make an advisor omit or fudge raw facts, while it is quite likely to have just such an effect on materials reflecting deliberative or policy-making processes") (internal citations and quotation marks omitted). The cases in which the fact/opinion distinction leads to the incorrect outcome are those in which disclosure of facts would expose portions of the deliberative process that should not be exposed. *Petroleum Info. Corp. v. United States Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) ("The fact/opinion distinction, however, is not always dispositive; in some instances, the disclosure of even purely factual material may so expose the deliberative process within an agency that the material is appropriately held privileged") (internal quotation marks omitted).

Further, to the extent that there are any recommendations or opinions contained in the withheld material, they are not "inextricably intertwined" with purely factual material.

*Judicial Watch, Inc. v. DOJ*, 432 F.3d 366. 372 (D.C. Cir. 2005) ("Factual material is not protected under the deliberative process privilege unless it is 'inextricably intertwined' with the deliberative material[.]") For example, a file number or the name of a filing system that *was* searched can easily be segregated from any candid discussions about the pros and cons of various further search strategies.

Ultimately, "the key question in Exemption 5 cases [is] whether the disclosure of materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Dudman*, 815 F.2d at 1568. The redactions at issue here cannot reasonably be expected to have that effect. On Shapiro-190-5, for example, the redacted material consists of what document *was* located and what document *was* ordered. This redacted material is not part of any communication to anyone, but is instead a simple recording of actions taken. It is not an expression of any opinion, personal or otherwise, and revealing it will not mislead the public. *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 869 (D.C. Cir. 1980) ("The documents do not contain subjective, personal thoughts on a subject, so public knowledge of the documents will not subject the writer either to ridicule or criticism. Nor do they discuss the wisdom or merits of a particular agency policy, or recommend new agency policy, raising the possibility that their disclosure would mislead the public[.]") Revealing the information such as that redacted in Shapiro-190-5 will do the opposite of misleading the public; it will enlighten the public as to an actual (as opposed to contemplated) action taken by the agency. Indeed it is precisely the type of information that one might expect to find in a *Vaughn*

declaration, the function of which is to describe what steps were taken as part of the search so as to enlighten the plaintiff and the court as to how the search was conducted.

Additionally, little or no withheld communications appear to contain advice from a subordinate to a supervisor. To the contrary, the first and last redactions on page Shapiro-190-8, for example, consist of instructions from superiors to FOIA analysts regarding the reassignment of a case. (Shapiro 190-8, Communication from Supervisory Information Specialist: "Also, please if possible [REDACTED]. if [sic] the case is deemed a close then I will reassign back to you so you can receive credit.") As one would expect of such top-down communications, this material simply reflects documentation of a decision already made by a superior official regarding a reassignment, rather than any predecisional advice from a subordinate regarding search strategy. *Coastal States Gas Corp.*, 617 F.2d at 868 ("a document from a subordinate to a superior official is more likely to be predecisional, while a document moving in the opposite direction is more likely to contain instructions to staff explaining the reasons for a decision already made.")

### B.  Exemption 5-2 (Attorney Work Product Privilege)

The FBI withheld in its entirety document Shapiro-190-110 under Exemption 5 on the grounds of attorney work-product. According to Mr. Hardy, the document was "created by an attorney-advisor in defending the FBI's action on plaintiff's multiple FOIA requests. Specifically, it protected a report created by an attorney-advisor reflecting his/her research into the processing of the FOIA requests at issue in appeal reference number AP-2014-04332." (Hardy Decl. ¶ 106.) Separately, four documents, known as

Blitz forms, were withheld in part by OIP on the grounds that the information constitutes attorney work-product. (Brinkmann Decl. ¶ 19.)

"The work-product doctrine shields materials prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative[.]" *Judicial Watch, Inc. v. DOJ*, 432 F.3d 366, 369 (D.C. Cir. 2005) (internal quotation marks omitted). The D.C. Circuit has explained, "To meet that standard, we have held, the documents must at least have been prepared with a specific claim supported by concrete facts which would *likely* lead to litigation in mind." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1202 (D.C. Cir. 1991) (internal quotation marks omitted, emphasis added). More specifically, "[w]hen considering whether a document is prepared 'in anticipation of litigation,' this Court employs a 'because of' test, inquiring whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *FTC v. Boehringer Ingelheim Pharms., Inc.*, 778 F.3d 142, 149 (D.C. Cir. 2015). Notably, "[w]here a document would have been created in substantially similar form regardless of the litigation, work product protection is not available." *Id.*

Here, the report withheld by the FBI was intended to "defend[] the FBI's action on plaintiff's multiple FOIA requests" during an administrative appeal proceeding before OIP (Hardy Decl. ¶ 106) and the information redacted by OIP was part of its processing of Plaintiff's administrative appeals. Regardless of whether or not litigation was likely or even possible, an administratively appeal necessarily involves attorneys at the FBI defending their positions and OIP attorneys adjudicating the appeal. The same documents would therefore have been created in substantially similar form regardless of potential

litigation, and the work product protection is not available. *Boehringer Ingelheim*, 778 F.3d at 149. This is because the documents were prepared "in the ordinary course of business or for other nonlitigation purposes." *In re Sealed Case*, 146 F.3d 881, 887 (D.C. Cir. 1998) Attorneys and attorney-advisers in the administrative appeal process adjudicate and defend positions in the ordinary course of their business, for the nonlitigation purpose of permitting FOIA requesters to dispute an agency component's adverse determination. 5 U.S.C. § 552(a)(6). Presumably, the attorneys and attorney-advisers would produce substantially the same document for the administrative proceeding even if FOIA did not contain a judicial review provision, leaving the prospect of litigation nonexistent.

Any FOIA request as to which a requester administratively appeals *could* end up in litigation one day, but it is certainly not the case the every FOIA request for which the requester administrative appeals is *likely* to lead to litigation. Obviously only a fraction of cases that are administratively appealed will end up in litigation. Further, a FOIA requester can skip the administrative appeal process altogether and proceed directly to litigation if the agency does not respond within the statutorily mandated time period. Thus, if anything, a requester's filing of an administrative appeal signals that litigation is *less* likely to occur.

Rather than focus on whether an issue *could* end up in litigation one day, the D.C. Circuit has instructed that "the lawyer must at least have had a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable." *In re Sealed Case*, 146 F.3d at 884. Defendant offers no facts whatsoever to suggest that the lawyers who authored the documents had a subjective belief that litigation was a real

possibility, and no fact specific to this case that such a belief – if it existed – would have been objectively reasonable. Instead, Defendant has taken the radical position that any document generated by an attorney or attorney-adviser as part of an administrative appeal is *per se* created in anticipation of litigation. If the Court accepts this position, it would eviscerate the "anticipation of litigation" requirement of the attorney work-product doctrine any time an administrative proceeding is involved that is subject to eventual judicial review. *See In re Special September 1978 Grand Jury (II)*, 640 F.2d 49, 65 (7th Cir. 1980) (observing that the Seventh Circuit "refused to apply the work product doctrine where documents were prepared for actual . . . administrative proceedings[.]")

It is, of course, always in the mind of an attorney that litigation is a possibility and that it is prudent for the agency to attempt to comply with the law as best as possible. But that fact is insufficient to justify withholding under the attorney work-product doctrine. "While it may be true that the prospect of future litigation touches virtually any object of a DOJ attorney's attention, if the agency were allowed to withhold any document prepared by any person in the Government with a law degree simply because litigation might someday occur, the policies of the FOIA would be largely defeated." *Senate of P.R. ex rel. Judiciary Comm. v. United States DOJ*, 823 F.2d 574, 586-87 (D.C. Cir. 1987).

### C.  Exemption 6-2 and 7(C)-2 (Third Parties' Investigative File Serial)

Before conducting the balancing test under Exemption 6 and/or Exemption 7(C), the Court must first determine whether any substantial privacy interest at all is implicated. *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989) ("[W]e

must first determine whether their disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest. If no significant privacy interest is implicated (and if no other Exemption applies), FOIA demands disclosure.") For a privacy interest to exist, the production of the document must disclose information that can be attributable to an individual. *Arieff v. United States Dep't of Navy*, 712 F.2d 1462, 1468 (D.C. Cir. 1983) ("According to the statute, it is the very 'production' of the documents which must 'constitute a clearly unwarranted invasion of personal privacy.' 5 U.S.C. § 552(b) (6). Obviously, that can only occur when the documents disclose information attributable to an individual. The legislative history of Exemption 6 is clear on the point.")

Here, the FBI has withheld "an investigative file serial created to investigate specific individuals for possible violations of federal crimes." (Hardy Decl. ¶ 117.) However, the FBI has provided no plausible explanation as to how disclosure of a file serial[4] would lead to the revelation of an individual's identity. The FBI argues that "[r]elease of this information would allow for access, through the FOIA or otherwise, to information pertaining to the FBI's investigation of these individuals[.]" (Hardy Decl. ¶ 117) However, if a further FOIA request is required to obtain personally identifiable information, then the FBI's response to such a further request would be the point at which the FBI could assert privacy exemptions. Moreover, the FBI's opaque suggestion that personally identifiable information could be obtained "otherwise" demonstrates that FBI

---

[4] A file serial is simply a number reflecting the order in which the document was added to the file. ("Within each case file, pertinent documents of interest are 'serialized,' or assigned a document number in the order which the document is added to the file, typically in chronological order.") (Hardy Decl. ¶ 78.)

cannot articulate how personally identifiable information could be revealed by disclosure of the file serial.

### D.  Exemption 6-1 (Identifying Information of FBI Special Agents and Support Personnel)

The FBI asserts Exemption 6 to withhold "the names of and identifying information, to include administrative file numbers and serials, that pertain to FBI Special Agents ('SAs') and support personnel who are/were responsible for conducting, supervising, and/or maintaining official FBI business[.]") (Hardy Decl. ¶ 109.) Plaintiff does not seek the release of FBI Special Agent and support personnel names, but does challenge the applicability of Exemption 6 to "administrative file numbers and serials[.]" For substantially the same reasons described in the previous section, the FBI has not demonstrated how the administrative file number or serial would lead to the identification of any FBI special agent or support personnel. Accordingly Exemption 6 does not apply to this information.

### CONCLUSION

For the foregoing reasons, Plaintiff requests that the Court deny Defendant's motion for summary judgment and grant his cross-motion for summary judgment.

Respectfully Submitted,

_/s/ Jeffrey Light_____

Jeffrey L. Light
D.C. Bar #485360
1712 Eye St., NW
Suite 915
Washington, DC 20006
(202)277-6213
Jeffrey@LawOfficeOfJeffreyLight.com

*Counsel for Plaintiff*